UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) OSAKPAMWAN HENRY OMORUYI,<br>  a/k/a "Clifford Bernard" or "Bernard<br>  Clifford" and<br><br>(2) OSARETIN GODSPOWER OMORUYI,<br>  a/k/a "Nelson Bright" or "Bright Nelson,"<br><br>Defendants | Criminal No. 21-10217-PBS |

**GOVERNMENT'S JOINT SENTENCING MEMORANDUM FOR
OSAKPAMWAN HENRY OMORUYI AND OSARETIN GODSPOWER OMORUYI**

The defendants spent years enriching themselves at the expense of fraud victims and government benefits programs. The defendants knew their crimes were victimizing romance scam and other fraud victims, including the victims of identity theft, and committed the crimes anyway. To accomplish the frauds, the defendants obtained fake passports in the names of aliases, repeatedly lied to banks, and closely coordinated with their overseas co-conspirators. In total, the financial accounts the defendants personally controlled (not including co-conspirator accounts) received close to $2 million in fraud proceeds. The defendants' cut was somewhere between 22 and 30 percent, and the defendants transferred the majority of that money to their financial accounts in Nigeria and bought real estate in Nigeria.

The Court is faced with the sad reality that the defendants now have money and real estate waiting for them in Nigeria, obtained through frauds on romance scam victims and taxpayer-funded programs. The defendants have not returned a single penny of that money to date, and they never will. What remains is for the Court to decide the period of incarceration that is sufficient,

but not greater than necessary, to punish the defendants for their crimes, deter the defendants and others from committing these crimes in the future, and provide some small measure of justice to all the victims impacted by the defendants' crimes.

The government asks the Court to impose a sentence of 132 months as to each defendant as well as the applicable orders of restitution and forfeiture. This sentence would be above the median sentence imposed in similar cases (103 months) but on the low end of the Guideline Sentence Range (121 to 151 months). Such a sentence is warranted based on the particular facts of this case, which are addressed below.

I.     SENTENCING GUIDELINES, RESTITUTION, AND FORFEITURE

The government agrees with U.S. Probation's calculation of the U.S. Sentencing Guidelines for both defendants as reflected in the Presentence Investigation Report ("PSR"). The calculation of an Offense Level 32 for both defendants results in a Guideline Sentencing Range of 121 to 151 months and, according to records maintained by the U.S. Sentencing Commission, the median sentence for these sorts of crimes is 103 months. PSR at 35-37. The government also agrees with U.S. Probation's calculation of loss, and the resulting recommendation with respect to restitution and forfeiture for close to $2 million. PSR at 27-33.

Counsel for the defendants have represented that they intend on filing their sentencing memoranda in the coming days and objecting to various aspects of U.S. Probation's calculations in the PSR. The government will review those filings and anticipates filing a written response to in advance of the defendants' sentencing hearings.

II.    SENTENCING ARGUMENT

As described in more detail below, the Court should not grant the defendants a downward departure from the Guideline Sentencing Range where, as here, the scheme was so brazen and

long-running, resulting in such serious harm to victims, and the defendants, who apparently remain unrepentant for their crimes, stand to gain so much from the scheme even after their convictions.

    a. *Seriousness of the Offense and Harm Caused to Victims*

The crimes committed by Osaretin Omoruyi and Henry Omoruyi caused significant harm. The Court should consider the investigations and efforts required by the banks to remediate the multiple fake bank accounts opened by the defendants. The Court should also consider the harm caused to the U.S. government and its benefits programs that result from these frauds. Fraud in the unemployment system—which the defendants both exploited—is too common, costing the American taxpayer billions every year. *See* U.S. Government Accountability Office, *How Prevalent is Fraud in Federal Programs? We Take a Look—Focusing on Unemployment Insurance Oversight* (January 23, 2023), available a https://www.gao.gov/blog/how-prevalent-fraud-federal-programs-we-take-look-focusingunemployment-insurance-oversight. This type of fraud is particularly pernicious because it "hurts the integrity of federal programs and erodes the public's trust in government." *Id.*

But most importantly, the Court must fashion a sentence that is appropriate in light of the immense harm caused to the dozens of individual fraud victims. Both the defendants knowingly participated in romance scams and other frauds. By their very nature, these scams prey on lonely, often elderly, individuals' desire to find companions, using promises of love to persuade victims to wire large sums of money to the defendants.

The Court heard from some of these victims at trial, and many of their stories were heart-breaking. For example, the Court heard the following testimony:

- Linda Varner and Kim Hocker both testified that they were going through difficult times in their lives when they were defrauded. They joined Facebook, got a friend request, and over the course of months were convinced to send money to help a United States soldier serving overseas. But in truth, their money was going to the bank

accounts that Henry Omoruyi opened using his real name and the name of one of his aliases (Clifford Bernard). To finance these payments, Ms. Varner had to, among other things, refinance her home and go into debt. Because of this scam she has struggled financially and had to take a second job instead of retiring as she had planned.

- Jeanette Friedenberger testified that she met someone online who, over the course of months, convinced her that he was a successful international businessman, that he loved Ms. Friedenberger, and then tricked her into sending him a "loan." In truth, that money went to a bank account that Osaretin Omoruyi opened using his alias (Bright Nelson).

- Ping Yu testified that she was tricked into thinking she was loaning money to help a friend pay off a debt. In truth, that money went to a bank account that Osaretin Omoruyi had opened in the name of a fake business (Zion Cleaning).

- Venkatesh Sreeram testified that he met someone online he thought would be his future roommate and sent money to help them with their move. In truth, he was sending money to a bank account that Osaretin Omoruyi opened using his alias (Bright Nelson).

- Bruce Rioux testified that he was a nurse working overtime during the pandemic while Henry Omoruyi was spending unemployment money obtained using Bruce Rioux's stolen identity.

In addition to these victims, the Court should hold the defendants accountable for all the pain and harm caused to victims who were either unwilling or unable to testify at trial. For example, the government interviewed the following victims who sent money to Osaretin Omoruyi and Henry Omoruyi through accounts the defendants' opened using their real names and the names of their aliases and their fake business:[1]

- P.C., who sent hundreds of thousands of dollars because she thought she was helping a man she met online pay for, among other things, his medical bills, and she thought she would be getting her money back one day. To finance these payments, P.C. depleted her life savings and borrowed from family and friends, some of whom no longer speak to her because she owes them money. In her victim impact statement, she described how "the emotional pain and psychological damage I have sustained was beyond measure" and that she has "had to beg for food and assistance to help me."

---

[1] Out of respect for the privacy of victims who did not testify at trial, the government is using only their initials in this filing.

- M.P., who was contacted on Facebook and Instagram while she was going through cancer treatments and, after starting a relationship online, was convinced to send thousands of dollars.

- M.K., who met a man on "SilverSingles.com" and, after starting a romantic relationship, was convinced to send thousands of dollars for him to get a business loan.

- L.C., who sent thousands of dollars to a man she began a relationship with online to finance the man's travel to meet her in person.

Some of these witnesses refused to testify at trial because, as they put it, they were too scared or too embarrassed. But at sentencing, the Court can and should consider their statements to law enforcement.

    b. *The Defendants Knew Their Crimes Involved Victims of Romance Scams, Identity Theft, and Government Benefits Fraud*

The government anticipates that the defendants will claim they were just middlemen and did not know what the schemes entailed. That is not true. The Court should reject such arguments, which are entirely belied by the record.

First, it is clear that all parties—including the defendants' co-conspirators and other related defendants—knew they were involved in schemes that involved individual victims. The Court will remember that Henry's friend—Mike Amiegbe—testified that he knew he was involved in scams that involved victims, including romance scams, and that he discussed participating in victim-based scams with Henry. Additionally, the primary co-conspirator of both Henry and Osaretin—Macpherson Osemwegie—pleaded guilty to committing wire fraud conspiracy specifically involving romance scam victims. This evidence suggests that it was well-understood amongst the defendants, their friends, and their co-conspirators that these crimes involved fraud victims.

Second, beyond that obvious inference, the Court can and should look at the direct evidence presented at trial of the defendants' knowledge. For example, the defendants sent each other

messages discussing romance scams and other frauds that firmly establish that they both knew their crimes involved romance scam and other fraud victims. Most glaringly, in June 2020, the defendants' friends were arrested for committing similar crimes in the Boston area. Immediately after that arrest, Henry Omoruyi sent Osaretin Omoruyi the following screenshot (from the press release of the Massachusetts U.S. Attorney's Office):

> **Two Nigerian Nationals Charged with Defrauding Victims Using Online Scams**
>
> BOSTON — Two Nigerian nationals were arrested on Friday, June 12, 2020 and charged in connection with defrauding victims using various online scams during the COVID-19 pandemic.
>
> Nosayamen Iyalekhue, 33, and Esogie Osawaru, 27, were charged by criminal complaint with one count of wire fraud. The defendants were detained following an initial appearance.
>
> According to the criminal complaint, Iyalekhue and Osawaru participated in a series of romance, pandemic unemployment insurance, and other online scams designed to defraud victims by convincing them to send money to accounts controlled by the defendants. To carry out the scams, the defendants allegedly used false foreign passports in the names of others, but with their photos, to open numerous bank accounts, and in turn directed the victims to send money to these accounts. Iyalekhue and Osawaru then rapidly withdrew the victims' money from various bank branches and ATMs, often multiple times during a single day. It is alleged that the schemes included collecting unemployment insurance in the name of others during the COVID-19 pandemic.

As the Court can see, this press release, which the defendants were reading and sending to each other, states that the conduct—the exact same conduct the defendants were involved in—was victimizing individuals through "romance, pandemic unemployment insurance, and other online scams designed to defraud victims by convincing them to send money to accounts controlled by

the defendants."[2]  Nevertheless, the defendants *continued committing these same crimes for at least nine months*, up until they were arrested in March 2021.

Beyond the text messages between the defendants discussing "romance" scams, the other communications on Osareitn Omoruyi's phone make clear that the defendants knew that their crimes involved fraud victims.  As just a couple examples:

- October 31, 2020—after the defendants' friends had been arrested for "romance" and "other online scams"—the defendants' co-conspirator ("Godfery") discussed laundering money with Osareitn, and told Osaretin that "the Mugu" would be sending money.  As the Court heard at trial, "the Mugu" translates to "the fool" or "the idiot."  In March 2021, that same co-conspirator negotiated with Osaretin for Osaretin to open a Facebook account in the name of a fake person so that "Godfery" could "use it to hustle."  The co-conspirator later notified Osaretin that "she is mailing" a "money order" to "Bright Nelson" (the defendant's alias).

- On November 16, 2020—once-again, after the defendants' friends had been arrested for "romance" and "other online scams"—the defendants' family member sent Osaretin Omoruyi a screen shot of direct communications with another fraud victim.  In that communication, the defendants' co-conspirator was tricking the victim into sending money purportedly to pay for medical care in Afghanistan through the United Nations.

Lastly, but importantly, there is clear evidence that the defendants knew their scheme involved multiple stolen identities.  Henry Omoruyi opened and controlled the storage unit that contained multiple pandemic assistance debit cards *in the names of identity-theft victims*.  The pandemic assistance payments that went into the defendants' fraudulently-opened bank accounts also listed *the names of the identity theft victims* in whose identities the fraudulent payments were being made.  Osaretin Omoruyi's phone messages with a contact listed as "My Dad" even contained screenshots from an article detailing how a "Nigerian crime ring is exploiting the COVID-19 crisis" through the use of stolen "Social Security numbers and other personally

---

[2] Both of these defendants pled guilty.  One of them also identified both defendants and admitted to speaking with Henry Omoruyi about the crimes they were both committing using fake passports and fraudulently-opened bank accounts.

identifiable information" from "first responders, government personnel and school employees." Here is what "My Dad" showed Osaretin Omoruyi:



Simply put, the idea that the defendants did not know their crimes involved real-life, individual victims—including the victims of romance scams and identity theft—is absurd. At sentencing, where the Court employs a preponderance of the evidence standard, the Court can and should find, based on all of the information above and the information presented at trial, that both Henry Omoruyi and Osaretin Omoruyi were fully aware that their crimes involved identity theft and frauds on individual victims. The Court should also sentence the defendants accordingly.

c. *Specific Deterrence*

The defendants' have demonstrated a prolonged willingness—over the course of multiple years—to victimize others for the sake of personal gain. To commit these crimes, the defendants created multiple aliases and obtained multiple fake passports, including the following:





Exs. 4, 24, 189, and 190. The defendants also lied to banks, repeatedly, over the course of years, including in multiple phone calls and in-person interactions with bank personnel. Their participation in this scheme was therefore far from a momentary lapse in judgment or weakness of will. Nor did the defendants act out of coercion, duress, or desperation. For financial crimes, these factors point toward the highest degree of culpability and reflect a high risk of recidivism.

The defendants also profited significantly from this scheme, which only further incentivizes them to participate in these schemes once-again after their release from incarceration. As the government demonstrated at trial, through bank records and summary charts, the defendants transferred much of their fraud proceeds overseas, including to accounts in their own names. For

9

example, *in 2020 alone,* and from a *single U.S.-based bank account*, Osaretin Omoruyi transferred *more than $250,000 to his own Nigerian bank accounts*, as reflected here:

**Osaretin Omoruyi**
**2020 International Wires Sent to First Bank of Nigeria from JPMC x8196**

| Date | Sent To | Wire Memo | Amount | Date | Sent To | Wire Memo | Amount |
|---|---|---|---|---|---|---|---|
| 06/08/20 | Osaretin Omoruyi | Family Expenses | $ 6,000.00 | 09/25/20 | Osaretin Omoruyi | Real Estate Purchase | $ 4,500.00 |
| 06/26/20 | Osaretin Omoruyi | Real Estate Purchase | $ 8,000.00 | 09/28/20 | Osaretin Omoruyi | Real Estate Purchase | $ 4,000.00 |
| 07/01/20 | Osaretin Omoruyi | Real Estate Purchase | $ 8,000.00 | 10/28/20 | Osaretin Omoruyi | Real Estate Purchase | $ 8,500.00 |
| 07/14/20 | Osaretin Omoruyi | Real Estate Purchase | $ 11,500.00 | 11/03/20 | Osaretin Omoruyi | Real Estate Purchase | $ 3,000.00 |
| 07/21/20 | Osaretin Omoruyi | Real Estate Purchase | $ 6,000.00 | 11/23/20 | Osaretin Omoruyi | Real Estate Purchase | $ 12,000.00 |
| 07/27/20 | Osaretin Omoruyi | Real Estate Purchase | $ 17,000.00 | 12/07/20 | Osaretin Omoruyi | Real Estate Purchase | $ 10,000.00 |
| 08/05/20 | Osaretin Omoruyi | Real Estate Purchase | $ 41,000.00 | 12/10/20 | Osaretin Omoruyi | Real Estate Purchase | $ 12,500.00 |
| 08/13/20 | Osaretin Omoruyi | Real Estate Purchase | $ 10,000.00 | 12/17/20 | Osaretin Omoruyi | Real Estate Purchase | $ 4,000.00 |
| 08/18/20 | Osaretin Omoruyi | Real Estate Purchase | $ 10,000.00 | 12/22/20 | Osaretin Omoruyi | Real Estate Purchase | $ 15,500.00 |
| 08/24/20 | Osaretin Omoruyi | Real Estate Purchase | $ 20,000.00 | 12/28/20 | Osaretin Omoruyi | Real Estate Purchase | $ 10,000.00 |
| 09/01/20 | Osaretin Omoruyi | Real Estate Purchase | $ 15,000.00 | 12/30/20 | Osaretin Omoruyi | Real Estate Purchase | $ 10,000.00 |
| 09/09/20 | Osaretin Omoruyi | Real Estate Purchase | $ 5,000.00 | | | Total | $ 256,500.00 |
| 09/21/20 | Osaretin Omoruyi | Real Estate Purchase | $ 5,000.00 | | | | |

Ex. 99 at 49. Similarly, *in 2020 alone,* and from a *single U.S.-based bank account*, Henry Omoruyi transferred *nearly $120,000 to his own (or Osaretin's) Nigerian bank accounts*, as reflected here:

**Henry Omoruyi**
**2020 International Wires Sent to First Bank of Nigeria from JPMC x1318**

| Date | Sent To | Wire Memo | Amount | Date | Sent To | Wire Memo | Amount |
|---|---|---|---|---|---|---|---|
| 06/03/20 | Henry Omoruyi | Family Expenses | $ 500.00 | 10/28/20 | Henry Omoruyi | Health/Medical Services | $ 4,000.00 |
| 07/15/20 | Henry Omoruyi | Real Estate Purchase | $ 500.00 | 11/02/20 | Henry Omoruyi | Education Expenses | $ 1,000.00 |
| 07/22/20 | Henry Omoruyi | Funding Investments | $ 1,000.00 | 11/04/20 | Henry Omoruyi | Family Expenses | $ 4,000.00 |
| 07/27/20 | Henry Omoruyi | Personal Expenses | $ 1,000.00 | 11/10/20 | Osaretin Omoruyi | Family Expenses | $ 5,000.00 |
| 08/13/20 | Henry Omoruyi | Business Expenses | $ 2,000.00 | 11/17/20 | Osaretin Omoruyi | Family Expenses | $ 3,850.00 |
| 08/20/20 | Henry Omoruyi | Business Expenses | $ 2,000.00 | 11/23/20 | Osaretin Omoruyi | Family Expenses | $ 3,000.00 |
| 09/23/20 | Osaretin Omoruyi | Real Estate Purchase | $ 4,000.00 | 12/01/20 | Osaretin Omoruyi | Health/Medical Services | $ 5,000.00 |
| 09/28/20 | Henry Omoruyi | Real Estate Purchase | $ 8,000.00 | 12/07/20 | Osaretin Omoruyi | Health/Medical Services | $ 5,000.00 |
| 10/02/20 | Henry Omoruyi | Health/Medical Services | $ 6,000.00 | 12/09/20 | Osaretin Omoruyi | Health/Medical Services | $ 5,000.00 |
| 10/05/20 | Henry Omoruyi | Family Expenses | $ 6,000.00 | 12/21/20 | Henry Omoruyi | Business Travel | $ 5,000.00 |
| 10/05/20 | Henry Omoruyi | Education Expenses | $ 4,000.00 | 12/22/20 | Henry Omoruyi | Family Expenses | $ 7,000.00 |
| 10/06/20 | Henry Omoruyi | Family Expenses | $ 6,400.00 | 12/23/20 | Henry Omoruyi | Family Expenses | $ 6,000.00 |
| 10/13/20 | Henry Omoruyi | Personal Expenses | $ 4,000.00 | 12/23/20 | Osaretin Omoruyi | Family Expenses | $ 1,500.00 |
| 10/15/20 | Henry Omoruyi | Personal Expenses | $ 3,200.00 | 12/28/20 | Osaretin Omoruyi | Business Expenses | $ 9,700.00 |
| 10/19/20 | Henry Omoruyi | Health/Medical Services | $ 6,000.00 | | | Total | $119,650.00 |

Ex. 99 at 32.

10

Based on memo lines in the bank statements, as well as the messages and pictures found on Osaretin Omoruyi's phone, the Court can also see what these fraud proceeds purchased in Nigeria. For example, Osaretin Omoruyi's phone contained multiple pictures and records from an engineering firm showing multiple buildings being built for the client "Osaretin Omoruyi," pictures of mock-ups for a future apartment complex called the "Omoruyi Apartments," estimates for different stages of work on the project, a separate mansion being built, and pictures of construction occurring on what appears to be those buildings and that mansion. Here are but a few examples of the dozens of pictures on Osaretin Omoruyi's phone on this topic:









| ESTIMATE BREAKDOWN IN DIFFERENT STAGES OF WORK | |
|---|---|
| **STAGE 1** | |
| Foundation work to D.P.C level | |
| Demolition work | -N- 250,000.00 |
| Material | -N-2,306,650.00 |
| Labour | -N- 990,000.00 |
| Total | -N-3,546,650.00 |
| **STAGE 2** | |
| From D.P.C to decking level | |
| Material | -N-2,228,000.00 |
| Labour | -N- 700,000.00 |
| Total | -N-2,928,000.00 |
| **STAGE 3** | |
| Decking work | |
| Material | -N-3,105,500.00 |
| Labour | -N- 800,000.00 |
| Total | -N-3,905,500.00 |
| **STAGE 4** | |
| From decking level to roof level | |
| Material | -N-2,228,000.00 |
| Labour | -N- 800,000.00 |
| Total | -N-3,028,000.00 |
| **STAGE 5** | |
| Roofing work including paraphet and the wooden members | |
| Summarize to | -N-4,050,000.00 |

The Court can reasonably infer, on a preponderance of the evidence standard, that these properties and the fraud proceeds—including the massive amount of fraud proceeds transferred to Nigeria for "real estate"—are waiting for the defendants if and when they return to Nigeria. This level of profit only further inflates the defendants' risk of recidivism (as well as the need for a general deterrent, discussed below).

Further, as discussed above, even the clear threat of prosecution has not stopped the defendants from committing crimes in the past. For example, even after the defendants' friends, who were living in the defendants' same neighborhood, were arrested for committing these same crimes, the defendants continued committing these crimes *for nine months and only stopped when*

*they were arrested*.  This clearly demonstrates that the defendants pose a uniquely high risk or recidivism such that a sentence must specifically deter them in the future.

Lastly, the fact that the defendants will likely be deported after their period of incarceration will not itself provide a specific deterrent.  As the Court saw at trial, these crimes require two groups of co-conspirators: fraudsters overseas who are contacting victims and their counterparts in the United States who receive the victims' money.  Even after their return to Nigeria, the defendants will have not only the proceeds from this scheme, but also every opportunity to participate in future schemes.  Both defendants were born and raised in Nigeria and regularly travelled there prior to their arrest.  Ex. 80 at 6, 9.  And as the government demonstrated at trial, the defendants have a network of co-conspirators in Nigeria and surrounding West African countries.  The following are just a few examples of the defendants' overseas co-conspirators that the government identified in trial exhibits:

- Ex. 127.1 (WhatsApp Chat with "Danny Omoruyi" / Nigerian Country Code);
- Ex. 128.1 (WhatsApp Chat with "Godfery" / Benin Country Code);
- Ex. 129.1 (WhatsApp Chat with "Osaheni" / Nigerian Country Code);
- Ex. 130.1 (WhatsApp Chat with "Ehis 2" / Nigerian Country Code);
- Ex. 132 (WhatsApp Chat with "Runthings Major" / Ghana Country Code); and
- Ex. 199 (WhatsApp Chat with "Ghetto Dreamz" / Nigeria Country Code).

Given this network available to the defendants, and for the reasons outlined above, the Court should impose a sentence that will specifically deter these defendants from exploiting victims after their release.

*d. General Deterrence*

General deterrence is particularly important here. Online scams taking advantage of the lonely and elderly are rampant. *See, e.g.*, Federal Trade Commission, "Romance scammers' favorite lies exposed," Feb. 9, 2023, *available at* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2023/02/romance-scammers-favorite-lies-exposed#ft1 (reported losses from online romance scams reached a "staggering" $1.3 billion across 70,000 victims in 2022).[3] The scam is relatively easy to complete, and the huge amounts of money make it attractive to carry out for individuals, like the defendants, who have no regard for the victims. Often, those "wooing" the victims are located overseas, out of the reach of the government's jurisdiction. But, they depend on participants in the United States, like the defendants their co-conspirators, to accomplish the scheme. The defendants' sentences should reflect the clear need to deter the many others who might otherwise engage in the same sort of misconduct if there is to be any chance of driving down the billions in losses to victims annually. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated then sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation omitted).

---

[3] *See also* Federal Trade Commission, "Reports of romance scams hit record highs in 2021," Feb. 10, 2022, available at https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/02/reports-romance-scams-hit-record-highs-2021 (reported losses reached $547 million in 2021); Federal Trade Commission, "Romance scams take record dollars in 2020," Feb. 10, 2021, available at https://www.ftc.gov/news-events/blogs/data-spotlight/2021/02/romance-scams-take-record-dollars-2020 (reported losses reached $304 million); Federal Trade Commission, "New FTC Data Show Consumers Reported Losing More Than $200 Million to Romance Scams in 2019," Feb. 12, 2020, available at https://www.ftc.gov/news-events/press-releases/2020/02/new-ftc-data-show-consumers-reported-losing-more-200-million (reported losses reached $201 million, up 40% from 2018).

e. *Avoiding Unwarranted Sentencing Disparities*

A sentence for both defendants within the Guideline Sentencing Range is appropriate for all the reasons stated above. According to the U.S. Sentencing Commission, the median sentence for crimes of a similar nature is 103 months. PSR at 35-37. However, that sentence is inappropriately low where, as here, the defendants will be able to keep all the profits from their unlawful scheme even after their convictions at trial.

If the Court finds there is good cause to sentence the defendants to a period of incarceration below even the median sentence—which the Court should not do—the government asks that the Court impose a sentence of more than 63 months to avoid unwarranted sentencing disparities. Specifically, the case of *United States v. Iyalekhue*, 20-cr-10208-RWZ, arose from the same investigation that resulted in the prosecution of the defendants. Iyalekhue was in the same social circle as the defendants and committed substantially similar conduct. Iyalekhue pled guilty to a criminal Information charging one count of conspiracy to commit mail and wire fraud and one count of money laundering. Judge Zobel sentenced Iyalekhue to 63 months of incarceration.

Iyalekhue's sentence should be lower than the defendants' respective sentences for several reasons. First, Iyalekhue accepted responsibility and pled guilty. Second, while this Court has clear evidence that the defendants knew the types of victims targeted in these scams, Judge Zobel did not have that same evidence with respect to Iyalekhue. Third, while this Court has clear evidence that the defendants provided substantial assistance to their friends and co-conspirators to commit similar crimes (*e.g.*, Henry storing co-conspirators' fraudulent passports in his storage unit and Osaretin connecting those co-conspirators with his overseas contacts who were conducting the scams), Judge Zobel did not have that same evidence with respect to Iyalekhue. Fourth, and lastly,

Iyalekhue caused a lower loss amount ($813,098) than the defendants. The Court should therefore sentence the defendants to a period of incarceration that is substantially higher than the 63-month sentence for Iyalekhue imposed by Judge Zobel.

### III.  Conclusion

For the reasons set forth above, the Court should impose a sentence of 132 months as to each defendant as well as the applicable orders of restitution and forfeiture.

Respectfully submitted,

JOSHUA S. LEVY<br>
Acting United States Attorney

By: /s/ Christopher J. Markham<br>
CHRISTOPHER J. MARKHAM<br>
BENJAMIN A. SALTZMAN<br>
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: October 26, 2023

*/s/ Christopher J. Markham*
CHRISTOPHER J. MARKHAM
Assistant United States Attorney